Daniel, J.
I think that the judge of the Circuit court of Botetourt did not err in his opinion and decree of April 1839, in holding, “ that as by the terms of dissolution Wood was to pay the debts of the firm, and for that purpose took all the property, real and personal, it was not competent for the retiring partner (Mday) to acquire an ineumbrance on any part thereof, to the prejudice of the rights of a creditor of the firm.” The truth of the proposition of law involved in so much of the opinion is obvious, and was not seriously controverted in the arguments of the appellant’s counsel here. It is, I think, also evident, that regarding the testimony in the view most favorable to the cause of the appellant, and estimating the personal property at the highest valuation which any of his witnesses place upon it, there is a sufficient amount and more than a sufficient amount of partnership debt shown to be embraced in the bond and deed of trust of the 4th of October 1834, to absorb any surplus that could *462 arise out of the avails of the trust fund, after satisfying the prior and well established lien of Wiley.
If I am correct in this view, it is manifest that there. is no longer any question (except that of costs) arising out of the inter] ocutoiy decree of 1839, and the final decree of 1843 in the original suit, which Mday could now ask us to consider; the real object of that suit being not to determine any controversy as to the personal liability of Mday for the debt claimed by Harvey & Go., but to enjoin a sale of the property under the ' deed of trust, till the amount and priority of the sever ral liens could be ascertained and adjusted; and then to have a disposition of the fund according to the respective rights of the several claimants. There is, I think, however, a manifest error in the final decree in regard to .the costs of the suit, which Mday has a right to have corrected. In any aspect of the case he came properly into court. There were clouds over the title of the property which he had a right to have removed; conflicting claims to the fund, which he had a right to have settled before a sale should take place. Having thus come ■ properly into court, he ought not to have been subjected to payment of costs, but ought, on the contrary, to have had a decree for costs.
The main matter of controversy, which it is of moment, now to Mday to have considered, is. that which arises out of the cross bill filed by .Harvey & Co. in 1842. After applying so much of the proceeds, of the trust fund as was applicable thereto to the payment of the bond for 2485 dollars 5 cents, there remains a large balance due upon it; and Wood, who is shown to be wholly insolvent, has left the state. In this state of things Harvey & Go. seek by their cross bill to make Mday personally responsible for this balance. They allege that Mday and Wood were partners, and that the claim of 2485. dollars 5 cents, for which Wood gave his individual bond, was a debt contracted with them by *463 said Wood and Niday, as partners. They refer to the proceedings in the original suit of Niday, and to the opinion of the judge expressed in the decree of 1839, holding that the bond was taken for a debt contracted by the firm of Wood & Niday, and that the execution of Ms individual bond by Wood did not operate, in equity, a discharge of his copartner Niday.
Niday in his answer admits that the bond was given in part for debts due by the firm, but alleges that much the larger portion of the consideration on which it was founded was the individual indebtedness of Wood. He states that a dissolution of the firm of Wood & Niday took place in August 1834; and that by the terms of the dissolution Niday was to give up his certain interest in the partnership property, and Wood, in consideration thereof, agreed to become solely responsible for the debts: That in October 1834, after the dissolution of the firm, Harvey, with a view of securing the debt from Wood, proposed taking a deed of trust upon the said Wood’s property, including the iron works property: That Wood refused to give the deed, unless Harvey would consent to release Niday ■from the several notes and claims which had been executed in the name of Wood & Niday to Harvey & Co., and would surrender up the said notes, to be canceled: That Harvey thereupon agreed to- surrender the said notes, and release Niday from the payment thereof, ‘provided certain individual- debts due from Wood to Harvey & Co. were also embraced in a bond to be given by the said Wood, and secured by such deed: That this condition was assented to by Wood, and the bond and deed of trust accordingly executed. He calls upon the plaintiffs to produce their account against the firm of Wood & Niday, and all the evidences of debt which they may have against them, and also to furnish proof of the indebtedness of Wood & Niday to "the *464 amount of the bond; and he also contends, that as the claim of the plaintiff is founded on simple contract, and more than five years have been permitted to run before the filing of the cross bill, he is now protected by the statute of limitations, which he asks to be permitted to rely on as fully as if it was specially pleaded.
The judge of the Circuit court in his decree has carried out the views of Harvey & Co., and made Mday personally responsible for the debt. In this I think he has erred. I think that the execution of the bond and deed of trust, taken in connection with the attendant circumstances and the subsequent conduct and declarations of Harvey, ought to have been regarded by the court as operating an extinguishment of all personal liability on the part of Mday, as well in equity as at law. It was argued by the counsel of the appellees that this question was adjudicated by the interlocutory decree of 1839 rendered in the original suit; and that as the said decree had never been set aside, the court was bound, when it came to render the decree in the cross suit, to act in conformity with it, and to hold Mday personally responsible for the debt. I do not think so. It is true that the judge in rendering the decree of 1839 did express the opinion, that as it appeared by the testimony in the cause that the debt due to Harvey & Co. was contracted by the firm of Wood & Mday, the settlement of the account, and the ■execution by Wood of his separate bond and deed of trust, would not operate in equity as a discharge of his* copartner. It is also true that Harvey and Mitchell, in their joint answer to Mday’s bill, aver, that by taking the individual bond of Wood, they did not relinquish their recourse against Mday, as one of the partners of the firm of Wood & Mday; and that Harvey in his separate answer says that the firm of Harvey & Co. never intended, by taking Wood’s bond for the balance due from Wood & Mday, to thereby release Mday, or *465 lessen their security in anyway; and that he is advised that the firm of Harvey & Co. will have a just and legal claim upon the complainant (Mday) himself for any balance of their debt not paid by the proceeds of the sale under the deed.
Still, when we look to the object of Mday’s suit, the character of the allegations made in his bill, and the relief sought, it is obvious that no issue was properly made as to the effect of the execution of the bond and deed of trust upon his personal liability for the debt; and that in order to determine which should be first satisfied out of the proceeds of the trust fund, Mday or Harvey & Co., it was not necessary to decide whether the execution of the bond and deed of trust by Wood extinguished the liability of Mday, or still left him personally responsible for the debt. The expression of any opinion as to the effect of the execution of the bond and deed of trust upon the personal liability of Mday being thus out of the real issue between the parties when the decree of 1839 was rendered, I do not think that the said decree can be relied on as concluding Mday in a proceeding subsequently instituted by Harvey & Co., with a view to obtain a personal decree against him for the debt. The question as to Mday’s continuing liability for the debt, was first fairly presented for decision in the cross suit; and when the original and cross suits came on to be finally heard together in 1843 it was I think competent for the court, notwithstanding the interlocutory decree of 1839, and without any formal motion for rehearing it, to look fully into the whole case, to refer to all the evidence bearing on Mday’s liability that had been taken in the original suit previous to the rendition of the said interlocutory decree, and also to the deposition of Looney that seems to have been taken a short time thereafter, and to decide the question of Mday’s liability, untrammeled by what was *466 said by the judge in reference thereto, in rendering the before mentioned interlocutory decree of 1839.
Looking at the case thus presented, it seems to me that Mday should have been regarded as no longer bound, either at law or in equity, for the payment of the debt.
It has been held in some cases that a bond given by one partner for a simple contract debt due from a firm, to the creditor, and accepted by the latter, operates of itself, an extinguishment of the simple contract both at law and in equity; that the giving and acceptance of the bond amounts to a release at law of the other partner, and an extinction of the simple contract debt; and that though equity will interpose its aid when a remedy is wanting at law, the demand continuing, yet it cannot revive a debt which in law is extinguished. The case of Williams v. Hodgson, 2 Har. & John. 474, is one in which this doctrine is fully maintained.
It may however, I think, be stated as the well settled doctrine of this court, that whilst the mere acceptance of such higher security by a creditor from one member of a firm for a partnership debt due by simple contract, destroys-the right of the creditor to proceed at law against the member who was not a party in giving such higher security; yet that a court of equity will look at the original character of the debt, and will not withhold relief against the member not uniting in the higher security, merely because of the merger and destruction of the legal remedy against him ; but -will treat that simple contract as a debt still subsisting in foro conscientice, unless it is shown that the creditor intended by accepting such higher security to abandon all recourse upon his original demand. In other words, that in a court of law the higher security operates per se a destruction of the simple contract; but that in a court of equity, whether such is to be the effect of the transaction, is a question to be de *467 cided by proof of tbe intention of the parties. If by taking such higher security it was not the design of the parties that the social debt should be wholly extinguished, equity will still hold all the partners bound. If on the other hand, the higher security is given and accepted as a substitute for the original simple contract of the firm, and with the intention to absolve the firm, all remedy upon the latter is gone in equity as well as at law.
Testing the case by these principles, it seems to me that Niday’s defence to the cross bill is fully sustained. The proofs tending to show that in giving and taking the bond and deed of trust, the parties intended that Niday should be no longer looked to for payment of the debt, are numerous, and when taken all together, are to my mind conclusive :
1st. Mday, though residing in the neighborhood, is not consulted as to the arrangement. The individual bond of Wood is taken, payable twelve months after date, and the deed of trust, which is not to be closed till the end of a year after its date, embraces horses, oxen, wagons, and all the stock of goods then on hand and which might be on hand at the expiration of the time for closing the deed; property which, from its nature, was liable to be wasted and consumed, or greatly deteriorated in value by the use.
2d. It is proved that Harvey placed a high value on the real estate embraced in the deed, and that he desired to purchase it, and also to purchase paper on Wood, declaring that it would be as good to him as cash.
3d. It is proved by Taylor, the trustee in the deed of trust of the 21st August, executed by Wood in part for the security of Niday, that in a conversation held between himself and Harvey just before he obtained the bond and deed of trust of the 4th October 1834, ■Harvey stated that Wood owed a large debt which he *468 had then come to see if Wood would make arrangements to secure; and further stated that if Wood would give him a deed of trust on his property he would give him time. That he then informed Harvey of the existence of this deed of trust of the 21st of August, and at his request showed it to him, and that Harvey read it and made remarks upon its contents. That deed, among other things, recited that by the terms of the dissolution Wood was to remain in possession of all the partnership effects, real, personal and mixed, as his own property, and was to be responsible to all the creditors of the said Wood 8f Niday, and also to the said Niday for all the debts due by the firm of Wood bf Niday, and also for the private debt due by Wood to Niday. The agreement between Niday and Wood that Wood alone should be responsible for the debts of the firm, could not of course, by itself, affect the right of any creditor of the firm to prosecute his demand against Niday, either at law or in equity. But proof of its existence, accompanied by full knowledge of its provisions on the part of Harvey, is strong, if not conclusive, to show that Harvey as well as Wood, by the arrangement of the 4th October, designed to release Niday from all further responsibility for the debt.
4th. Niday, in his answer, avers that it was part of the understanding between Wood and Harvey that the latter should deliver up to be canceled all the notes held by Harvey & Co. upon the firm of Wood & Niday; and he calls for the production of the account and all the evidences of debt held by the plaintiff, against the firm of Wood & Niday. The account is produced, and it appears therefrom and the evidence in relation thereto, that Harvey & Co. did hold several notes on Wood & Niday. These notes are not produced. Does not the failure to produce them and to account for their nonproduction, go far to sustain the statement of Niday, and to show that by the understanding and ar *469 rangement between Wood and Harvey, he was not to be regarded as any longer bound for the debt ?
5th. By the deposition of Looney it is proved that in a conversation with Harvey in December 1835, the latter stated that if he had known that Hiday was good he would not have released him from the payment of a debt against him and Wood. The particulars of the conversation, it is true, are not detailed, nor is there anything said referring the statement of Harvey to the particular debt in question. If, therefore, this deposition stood unaided by the other circumstances in the case, it would perhaps be unsafe to attach much importance to it in determining the rights of the parties. Ho other debt, however, is shown to have been due from Wood & Hiday; and it is not shown that Harvey had released Hiday from any other liability." Taking the deposition, therefore, in connection with the other proofs in the cause, it cannot be treated otherwise than as evidence of Harvey’s understanding of the effect of the transaction between him and Wood as a release of Hiday from the debt secured by the bond and deed of Wood.
Without further comment on the proofs and circumstances in the cause, it seems to me that they disclose such a dealing with Wood on the part of Harvey; such a trusting to and giving of time to him, without consulting Hiday; such a relying on the individual liability of Wood, as shows that his obligation and the means provided for its payment were alone looked to for the satisfaction of the debt: And in declaring that the execution and acceptance of the bond and deed of trust of the 4th October 1834 operated to release Hiday, as well in equity as at law, we shall be giving effect to the real intention and understanding of the parties concerned.
It is argued that such a course on the part of this court would conflict with its former decisions ; and we *470 are referred to Williams v. Donaghe’s ex’or, 1 Rand. 300; Sale v. Dishman’s ex’or, 3 Leigh 548 ; Galt’s ex’or v. Calland’s ex’or, 7 Leigh 594; and Weaver v. Tapscott, 9 Leigh 424. It is true that in each of these cases it was held that the giving by one of the partners of his -individual promise or obligation,for a debt of his firm, and its acceptance by the creditor, did not, under the circumstances, release the other partner in equity. But in neither of these cases were the circumstances attending the transaction similar to those found in the case under consideration. In the case of Williams v. Donaghe’s ex’or, no higher security was in fact taken. An account due by a firm was closed by the individual note of one of the partners, so that there was no release of the simple contract, either at law or in equity. There was no circumstance to show that the creditor intended, by taking the noté, to look alone to the individual responsibility of the partner giving it. It was alleged in the bill that the partner who gave the note (which was payable twelve months after date) was about to leave the state, and that the other partner was a nonresident, but a man of wealth and owning large possessions in the state. The court said that the debt did not cease to be the debt of the firm because of the execution of the note; and that the nonresidence of one of the partners gave jurisdiction to the court; and gave relief.
In Sale v. Dishman’s ex’or, a quantity of com had been delivered by Sale to the firm of Berryman & Dishman, in pursuance of a covenant which had been signed and sealed by Sale, and by Berryman alone, in the name of the firm of Berryman f Dishman; hut it appeared that Dishman had advised Berry?nan to purchase the corn. Dishman died before the debt was paid, and shortly after his death, in a settlement between Sale and Berryman the surviving partner, a balance was found due on account of the com; for this balance Berryman *471 gave Ms bond to Sale, who, however, declared at the time he took it, that he would not give up his recourse against Dishman’s estate. Some four years after tbe execution of tbe bond Sale filed Ms bill, alleging tbe insolvency of Berryman, and seeldng a decree against the executors of Dishman. This court reversed a decree of the chancellor dismissing the bill, and sustained the demand. They held that it was clearly the intention of the parties that the firm should be liable on the original contract; and neither the death of Dishman, nor the taking of the bond of Berryman, absolved the estate of Dishman in a court of equity. As to the effect of the execution of the bond, Judge Tucker said that “ the implication that the taking of Berryman’s bond was intended to absolve the partnership, was not only weakened by the fact that he was the only surviving partner, but was expressly repelled by Sale’s declaration at the time that he would not give up Ms resort to Dishman’s estate.”
In Galt’s ex’ors v. Calland’s ex’ors, the bond was executed by Bullock, in the name of the firm of Galt, Bullock & Co. It was given for money loaned to him for the firm, and upon its credit. It was shown that the creditor was regularly credited by the amount on the books of the firm, and that Gralt had often inspected the books, seen the credit, and made remarks on the heavy balance. There was not only the absence of any proof to show that Bullock alone was looked to, but the presence of the most convincing circumstances to show that the creditor and the partners of the concern all regarded and recognized the debt as a debt of the firm.
In Weaver v. Tapscott, the bond was given by Trimble, with Tapscott as security, for the hire of slaves to be employed as boatmen, for the benefit of the firm of Weaver & Trimble. There was no circumstance in the case from which it could be inferred *472 that the firm of Weaver & Trimble was discharged, and that the individual responsibility of Trimble was looked to. Judge Tucker said that the bond was the only ground of such inference, and that lost all its force when it was considered that it was most probably adopted in conformity with general usage in the hire of slaves, and in compliance with the notions and requisitions of the owner.
There is, I think, nothing in either of these cases which militates at all with the conclusions to which I have arrived in this; and I think that the Circuit court, instead of rendering a decree in favor of Harvey & Co. in their cross suit against Mday, ought to have dismissed their bill with costs.
It does not seem to me, however, that there is any error apparent on the face of the decree entitling Mday to a bill of review, nor do the facts which he states, with respect to the deposition of Campbell, bring his case within the scope of that relief which is given by a court of equity, on the score of newly discovered matters. I think, therefore, that the decrees of the 3d October 1844, and the 16th September 1847, should be both reversed, and the bill of review dismissed at Mday’s cost.
The other judges concurred.
The following is the decree of the court:
In the" original suit, the court is of opinion, that Mday came properly into court to enjoin the sale under the deed of trust of the 4th October 1834, till the cloud over the title of the real estate therein embraced could be cleared up, and the priorities of the competing liens on the trust property adjusted and settled; and therefore that it was error in the Circuit court, after having properly entertained his bill for this purpose, and given him relief on that score, to dismiss *473 the hill at his costs. The decree of the 6th October 1843 is, therefore, for that cause reversed. And this court proceeding, &c. the bill is dismissed at the costs of the appellees, Harvey & Co.
In the cross suit, the court is of opinion that the execution of the bond and deed of trust of the 4th October 1834 by Wood, and the acceptance thereof by Harvey, under the circumstances disclosed in the record, operated to absolve Hiday, as well in equity as at law, from all further personal liability on account of the debt of the firm of Wood & Hiday, for which the said bond was given. That the Circuit court therefore, instead of rendering a decree against Hi day for the balance due on said bond, ought to have dismissed the bill of the appellees with costs. The decree in the cross suit therefore of the 6th October 1843, is reversed. And this court proceeding to render, &c., the bill is dismissed at the costs of the appellees.
The court, however, is also further of opinion that there is no error of law apparent on the face of either of said decrees of the 6th October 1843, which entitled Hiday to a bill of review, and that the facts alleged by him in his bill of review and proved, in reference to the deposition of Campbell, do not fall within the scope of that relief which is afforded by the court in cases of the discovery of new matter. And that the Circuit court therefore erred in giving relief to any extent on the bill of review. The decrees of the 3d October 1844 and of the 16th September 1847, are therefore both reversed. And this court proceeding, &c., the bill of review is dismissed at Hiday’s cost.
The court is further of opinion that Hiday is entitled to his costs in this court, and decrees accordingly.